**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DENISE FERRARA, *in her individual capacity and as PROPOSED ADMINISTRATIX AD PRSEQUENDUM OF THE ESTATE OF DANIEL T. FERRARA, JR.*, <br><br> Plaintiff, <br><br> v. <br><br> MONMOUTH COUNTY, *et al.*, <br><br> Defendants. | Civil Action No. 24-4921 (GC) (TJB) <br><br> **OPINION** |

**CASTNER, District Judge**

 **THIS MATTER** comes before the Court on the Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 23 ("Amended Complaint")) for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (Rule 12(b)(6)) filed by Defendants Monmouth County, Monmouth County Sheriffs Office ("MCSO," named as the Monmouth County Sheriff's Department ("MCSD")), Monmouth County Sheriff Shaun Golden, Monmouth County Executive Undersheriff Theoadore Freeman, Warden Victor Iannello of the Monmouth County Correctional Institution ("MCCI"), Lt. Justin McNeill, Sgt. Michael Storcks, Correctional Police Officer Luca Del Giudice, Correctional Police Officer David Millard, and John Does 1-10 ("Motion to Dismiss").[1] (ECF No. 26.) The Amended Complaint was filed by Denise Ferrara, acting in her

---

[1]  The Court refers to Monmouth County, MCSO, Golden, Freeman, Iannello, and John Does 1-5 as "the Policymaker Defendants;" McNeill, Storcks, and John Does 6-7 as "the Field

individual capacity and as the proposed Administratrix *ad Prosequendum* of the Estate of Daniel

T. Ferrara, Jr. ("Plaintiff").  (ECF No. 23 at 1.)  Plaintiff responded to the County Defendants'

Motion to Dismiss (ECF No. 29), and the County Defendants filed a reply (ECF No. 31).  The

Court has carefully considered the parties' submissions and decides the matter without oral

argument under Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b).  For the

reasons set forth below, and other good cause shown, the County Defendants' Motion to Dismiss

is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Amended Complaint[2]

In her Amended Complaint, Plaintiff names as Defendants: Monmouth County, which

owns, operates, manages, and controls the MCCI; the MCSO, which is responsible for the

management and operation of the MCCI; Golden, who has served as the Sheriff of Monmouth

County since 2010; Freeman, the Executive Undersheriff of the MCSO; Iannello, who became the

Warden of the MCCI on November 30, 2021 (after having previously served as the Acting Deputy

Warden); McNeill, a supervisor at the MCCI; Storcks, another MCCI supervisor; Del Giudice, a

correctional police officer at the MCCI; and Millard, a correctional police officer at the MCCI.

(ECF No. 23 ¶¶ 10-22.)  The individual Defendants are named in both their official and individual

capacities.  (*Id.* ¶¶ 13-22.)

---

Supervisor Defendants;" and Del Giudice, Millard, and John Doe 8-10 as the "the CPO
Defendants."  Collectively, all moving Defendants are referred to as "the County Defendants."
The Amended Complaint also names ABC Entities 1-10 ("as yet unidentified public entities") as
Defendants.  (ECF No. 23 at 2.)  The Court refers to the decedent, Daniel T. Ferrara, Jr., as
"Daniel."  (*See Id.* ¶ 1.)

[2]     On a motion to dismiss, the Court accepts as true all well-pled facts in the Amended
Complaint.  *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) (quoting *Umland v.
PLANCO Fin. Servs. Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)).

### 1.    The Fatal Assault on Daniel

In her Amended Complaint, Plaintiff alleges that Daniel was an inmate at the MCCI, being held, upon information and belief, as a convicted prisoner. (ECF No. 23 ¶¶ 9, 45.)  Daniel was a trustee, *i.e.*, "an inmate who is permitted to work outside of his housing unit in various assigned capacities such as kitchen, food service, housekeeping, maintenance and things of that nature," and was assigned to work the morning shift in the kitchen on April 16, 2022. (*Id.* ¶¶ 1 n.1, 47.) McNeill was the Watch Commander, and his duties included supervising Storcks and the correctional police officers working that day. (*Id.* ¶ 48.)  Storcks, Del Giudice, and Millard were assigned to oversee the kitchen during the morning shift. (*Id.* ¶ 49.)  In addition to Daniel, there were at least nine other inmates assigned to work in the kitchen at the same time, including Evan Raczkiewicz. (*Id.* ¶¶ 20, 51.)

"Surveillance video shows that at about 5:17 a.m. that morning, Raczkiewicz approached Daniel from behind, and struck him multiple times in the head, leaving Daniel on the floor with severe injuries." (*Id.* ¶ 52 (emphasis omitted).)  The video "does not indicate the presence of CPO DelGiudice, CPO Millard and/or any other Correctional Officer on scene at the kitchen at the time of the assault." (*Id.* ¶ 53 (emphasis omitted).)

At approximately 5:18 a.m., another inmate (Kyle Martin) found Daniel unresponsive on the kitchen floor. (*Id.* ¶ 54.)  Martin called out to Rita Wade (a food service company employee), and Wade alerted Del Giudice. (*Id.* ¶ 55.)  It took about three minutes from the time of the assault for Del Giudice to arrive on the scene. (*Id.* ¶ 58.)

Del Giudice found that, although Daniel was moving, he was having trouble breathing and suffering from a possible seizure. (*Id.* ¶ 59.)  At 5:20 a.m. John Does 8-10 arrived and observed the situation, while, at about 5:21 a.m., MCCI medical staff arrived but were unable to get through

3

the doors to the kitchen. (*Id.* ¶¶ 60-61.) After going through a hallway and entering via a side door, Nurse Mckittrick and other medical staff entered the kitchen at approximately 5:22 a.m. and unsuccessfully attempted to revive Daniel. (*Id.* ¶ 62.) Atlantic Healthcare Paramedics administered CPR without success at about 5:54 a.m. (*Id.* ¶ 73.) At 6:03 a.m., Daniel was pronounced dead remotely by Dr. Chan from Morristown Medical. (*Id.* ¶ 64.)

The medical examiner initially listed the cause of death as a traumatic tear of the left vertebral artery due to blunt impact of the head, but the cause of death was later amended to traumatic basal subarachnoid hemorrhage due to blunt impact of the head. (*Id.* ¶ 65.) Raczkiewicz was charged and convicted of first degree aggravated manslaughter. (*Id.* ¶ 66.)

### 2.    The Alleged History of Violence Against Inmates at the MCCI

According to Plaintiff, the Policymaker Defendants "were on notice" of "multiple problems with inmate-on-inmate violence," "the lack of enforcement and/or promulgation of appropriate and necessary policies to remediate the chronic and severe problem," "understaffing and shortages in manpower effecting the safe operation of the jail," and "that officers were not properly attending to their ministerial duties" and "causing inmate on inmate violence or inmate/officer violence;" which the Policymaker Defendants "failed to remediate." (ECF No. 23 ¶ 77.) Similarly, the Policymaker Defendants, together with the Field Supervisor Defendants, were allegedly on notice that the physical set up and configuration of the kitchen required direct supervision, failing to provide for adequate staffing and staff placement was "a recipe for disaster in being able to effectively stop and prevent inmate violence," and "Best Practices for SOP and policy in that regard were not being implemented" (*i.e.*, constant in-person supervision as opposed

to outside or camera surveillance). (*Id.* ¶ 78.) The individual CPO Defendants were also "on notice of problems involving inmate on inmate violence and the need to remediate it."[3] (*Id.* ¶ 80.)

Plaintiff alleges "[s]everal examples of inmate assaults occurring at the MCCI are as follow, which should have been known to the Policymaker Defendants[ . . .] as well as the Supervisor Defendants Lt. Justin McNeill and Sgt. Storcks." (*Id.* ¶ 82.)

Specifically, Plaintiff cites to data from the New Jersey Department of Corrections ("NJDOC") regarding the number of inmate assaults reported at the MCCI in 2022: "Data collected from [NJDOC] inspection reports covering 2022 found that at MCCI, with an average reported daily census of 531 inmates, an average of two assaults on inmates were reported each week. This is the equivalent of 104 inmate assaults per year, an excessive amount that required remediation." (*Id.* ¶ 83.)

Plaintiff cites to prior lawsuits involving inmate-on-inmate violence or the use of excessive force by corrections officers at the MCCI. (*Id.* ¶¶ 82-90.) The Amended Complaint also refers to drug smuggling conspiracies and inmate overdoses. (*Id.* ¶¶ 91-94.)

Specifically, Plaintiff cites to "*Torres v. Monmouth County*, Docket No. 3:28-cv-17704 [sic] (FLW) (D.N.J. Aug. 25, 2021)."[4] (*Id.* ¶ 82.) According to Plaintiff's Amended Complaint, on September 11, and 12, 2017, Angelo Torres, a heavily medicated inmate in the MCCI medical facility, was attacked by another inmate who believed that the victim had heroin. (*Id.*) Torres asked to be moved to another area because he did not feel safe. (*Id.*) However, Torres's request

---

[3]    Plaintiff further asserts that the Policymaker and Field Supervisor Defendants were on notice that the physical configuration of the kitchen doors did not permit a stretcher to fit through them, thereby delaying the ability of medical personnel to provide life-saving care to inmates injured in the kitchen. (ECF No. 23 ¶ 79; *see also* ¶ 96 (alleging that the pervasive inmate-on-inmate violence at the MCCI mandated that every "corner" of the facility be accessible to stretchers and other medical equipment).)

[4]    The docket number for *Torres* is No. 3:19-cv-17704.

was denied, and he was instead told that he could move his bed (which he did, moving it approximately ten feet). (*Id.*). "One to two hours later, the same inmate who had already beaten . . . Torres, along with 5 to 6 other inmates, again attacked the victim, dragging him to a different area and beating and sexually assaulting him. None of the corrections officers on duty prevented the attack or intervened in the attack." (*Id.*)

Plaintiff claims "[i]nmate violence also includes the abuse and use of excessive force by corrections officers." (*Id.* ¶ 84.) "It is the overall safety and security of the inmates that is the issue and the failure to remediate, retrain, discipline, hold officers accountable and correct the misconduct which leads to continued misconduct and allowing violence to occur with impunity within the jail facility." (*Id.*; *see also id.* ¶ 85 ("The failure to stop the use of excessive force by corrections officer[s] . . . indicates a culture of tolerance and acquiescence to this kind of misconduct.").) Plaintiff cites to five prior lawsuits in which MCCI inmates claimed they were physically assaulted by corrections officers:

> 1.    Carl Koyi was unlawfully beaten by MCCI corrections officers on May 22, 2019. As he was being booked, Koyi hugged his girlfriend and was then immediately surrounded by several officers. Although Koyi dropped to a submissive position on the ground and offered no resistance, the officers beat him. The officers then took Koyi to another room, where, despite offering no resistance he was beaten again and his jumpsuit was torn off. Koyi was also sprayed with OC pepper spray in his face and genitals. During the assault, the officers uttered racist and anti-Muslim slurs, said they were going to "waterboard him," and poured water over Koyi's mouth and nose. (*Id.* ¶ 86 (citing *Koyi v. County of Monmouth, et al.*, Docket No. 3:19-cv-15605 (MAS) (ZNQ) D.N.J. Nov. 18, 2019)).)

> 2.    On October 20, 2015, Jeffrey Mayhue was being escorted in handcuffs back to his cell after receiving cancer treatment. Mayhue indicated that he was having trouble keeping up because of the effects of his treatment, and a corrections officer responded by grabbing him by the neck and slamming him to the ground. Another officer was present but did not intervene. (*Id.* ¶ 87 (citing *Mayhue*

*v. Monmouth County Correction Institution, et al.*, Docket No. 3:16-cv-705 (PGS) (D.N.J. Feb. 19, 2020)).)

3.      On February 19, 2018, during a search of the special housing unit, Kapri Drayton was instructed to spread his buttocks and lift his penis and testicles and then to run his fingers around his gumline. Dayton responded that he did not want to put his hands in his month because he had not taken a shower for several days. Approximately six officers then slammed him to the ground, beat him, thrust an object into his rectum, and said "this is what happens to n[----]s who don't comply." (*Id.* ¶ 88 (citing *Drayton v. Monmouth County Correctional Institution, et al.*, Docket No. 3:19-cv-22113 (GC) (JBD) (D.N.J. July 18, 2023)).)

4.      Kavan Costello, while being booked into the MCCI on February 17, 2020, was beaten by several corrections officers, who punched and kicked him in the head, face, and body despite the fact that he offered no resistance and did not fail to comply with their orders. Costello began to bleed all over his green jumpsuit, the jumpsuit was stripped off of him, and he was given a punk jumpsuit. The inmate lost a tooth, was grabbed by the throat, and taunted with homophobic slurs. Costello was then moved to a different location, where he was beaten again with punches to his head, face, and body, lost consciousness (and another tooth), and was doused with OC pepper spray while lying the ground. Although Costello suffered a concussion and lost two teeth, he did not receive medical treatment for several days. (*Id.* ¶ 89 (citing *Costello v. County of Monmouth, et al.*, Superior Court of New Jersey, Law Division, Monmouth County, Docket No. Mon-L-2735-21).)

5.      On September 2, 2021, corrections officers pepper sprayed Ife John while he was cooperating and packing his belongings to move to another cell. The officers also cut off the water to John's cell to prevent him from rinsing his eyes. (*Id.* ¶ 90 (citing *John v. Monmouth County Board of Commissioners, et al.*, Superior Court of New Jersey, Law Division, Monmouth County, Docket No. Mon-L-3603-21).)

In November 2022, Bryant Mack, who had been a corrections officer for 18 years, pled guilty to conspiring with inmates at the MCCI to smuggle controlled dangerous substances ("CDS") into the facility in potato chip bags and providing the drugs to his co-conspirators for distribution throughout the MCCI. (*Id.* ¶ 91 (citing "November 23, 2022 article on

MidJersey.com").) Likewise, from January to May 2022, MCCI employee Ryan Steinmetz ran a drug conspiracy with inmates distributing over 100 doses of Suboxone (an opioid). (*Id.* ¶ 92.) Steinmetz smuggled the CDS and other contraband to inmates, the inmates placed the drugs in food items and on food trays, and an inmate working in the kitchen then transported such trays throughout the facility. (*Id.*) MCCI inmate Alvin Hinton admitted that, on April 17, 2022, he smuggled fentanyl-laced heroin into the facility and gave it to another inmate (David Daniel), the other inmate died three days later from acute heroin/fentanyl poisoning, and Hinton was convicted of causing the inmate's death. (*Id.* ¶ 93 (citing "June 6, 2023, article on MidJersey,News.com").) On September 20, 2022, inmate Jennifer Trussel allegedly suffered a drug overdose from drugs provided to her by someone at the MCCI, and she died without receiving life-saving treatment, despite the fact that corrections officers responded while she was still alive and while such treatment could have been effective. (*Id.* ¶ 94 (citing *Trussel v. Monmouth County, et al.*, Docket No. 3:24-cv-00151).)[5]

Plaintiff claims that these examples (which are "only a sample" of incidents taken from accessible public sources) demonstrate that "the cost of failures by those responsible for the management and operation of correctional facilities to adequately enforce the policies and practices that are necessary to protect the rights and safety of the inmates for whom they are responsible are clear and severe and would be known to the CPO Policymaker Defendants." (*Id.* ¶ 91 (emphasis omitted).)

---

[5]    The name of the inmate who overdosed in September 2022 was Jennifer A. Ross. *Trussell v. Monmouth Cnty.*, No. 24-151, 2025 WL 914923, at *1-3 (D.N.J. Mar. 26, 2025).

### 3. The County Defendants' Alleged Failures to Protect Daniel and to Train, Supervise, or Discipline Subordinates

According to the Amended Complaint, the County Defendants' failures created a custom, practice and policy of tolerating misconduct leading to a pattern or history of violence at the MCCI, dereliction of duty, and Daniel's death. (ECF No. 23 ¶ 103.) "The failure to timely and adequately assist or come to the aid of Daniel and/or to protect him from harm was due to the gross dereliction by each" of the County Defendants: (1) "the CPO Defendants Del Guicide [sic] and Millard who failed to attend to their ministerial duties;" (2) "the Field Supervisor Defendants Lt. MacNeill and Sgt Storks who failed to supervise their subordinates to ensure that they were following policy and attending to their assignments and duties;" and (3) "the Policymaker Defendants Golden, Freeman and Iannello, who failed to promulgate and enforce their own policies and remediate inmate on inmate violence." (*Id.* ¶ 102 (emphasis omitted).)

"Specific policy and Standard Operating Procedures required that inmates doing kitchen duty were to be observed, monitored and supervised at all times, and should not be left alone." (*Id.* ¶ 71.) In fact, the kitchen contains utensils like knives, scissors, and plastic spoons that can be used as (or fashioned into) weapons. (*Id.* ¶ 72.) In violation of the applicable policies and procedures, not one CPO Defendant was present anywhere near or in the kitchen at or near the time of the assault, and, in addition, no CPO Defendant or supervisor was available to assist, or to supervise, monitor, or observe inmates working kitchen duty on the morning shift. (*Id.* ¶ 67.) Specifically, the two named CPO Defendants (Del Giudice and Millard) violated policy and procedure by refusing to attend to their daily assignments and ministerial duties, knowing that such failures would result in a substantial likelihood of harm to inmates left alone with no supervision "or deterrent capability." (*Id.* ¶ 69.) McNeill and Storcks (the Field Supervisor Defendants) failed

"to see to it" that their subordinates (the CPO Defendants) attended to their assigned duties, knowing that such failures would result in a substantial likelihood of harm to inmates left without such supervision or deterrent capability. (*Id.* ¶ 73.)

As a result of the failures of the CPO and Field Supervisor Defendants to perform their duties to monitor Plaintiff, Raczkiewicz, and other inmates on kitchen duty, Daniel was left unprotected and Raczkiewicz was left unmonitored and uncontrolled for so long that not only was "it easy for [Raczkiewicz] to beat [Daniel] to death" but Daniel was left to lie on the floor suffering for "several minutes" without anyone even knowing he needed help. (*Id.* ¶¶ 97-98.) Daniel was found by another inmate, and the CPO Defendants and Field Supervisor Defendants only discovered that Daniel had been attacked when notified by an inmate and a vendor's employee. (*Id.* ¶¶ 99-100.) Had the CPO and Field Supervisor Defendants been attending to their duties, the assault would not have occurred. (*Id.* ¶ 101.)

Furthermore, the Policymaker and Field Supervisor Defendants were responsible for ensuring that the CPO Defendants were properly trained and supervised on policies relating to staffing, inmate security, kitchen management and operation, and posts, and although there were specific policies and SOPs regarding such matters, they failed to enforce or implement such policies. (*Id.* ¶ 104.) The Policymaker and Field Supervisor Defendants also were on notice that inmate-on-inmate violence and correctional officer violence was a chronic and repetitive problem, there was insufficient coverage to properly monitor and supervise the inmates (including inmates assigned to the kitchen), staff were not doing their job, and the dangerous environment resulted from the failure to properly monitor, supervise, and observe the inmates both in the kitchen and other areas of the MCCI. (*Id.* ¶ 105.) Yet the Policymaker and Field Supervisor Defendants failed to correct these known problems, which resulted in Daniel's death. (*Id.* ¶¶ 98, 106.)

### 4. Plaintiff's Claims

In her Amended Complaint, Plaintiff asserts five counts: (1) a *Monell* and supervisory liability claim against Monmouth County, MCSO, and (acting in their official capacities) Golden, Freeman, and Iannello under 42 U.S.C. § 1983 (Count I); (2) an "individual liability" claim under § 1983 against the CPO Defendants, the Field Supervisor Defendants, and the individual Policymaker Defendants (Count II); (3) a claim against the County Defendants under the New Jersey Civil Rights Act ("NJCRA") (Count III); (4) a state law negligence claim (Count IV); and (5) a wrongful death claim (Count V). (ECF No. 23 ¶¶ 107-97.)

### B. Procedural History

Plaintiff filed her initial Complaint on April 12, 2024. (ECF No. 1.) On June 17, 2024, the County Defendants moved to dismiss the Complaint. (ECF No. 8.) On August 9, 2024, the Court entered a text order stating that Plaintiff may filed an Amended Complaint and terminating the motion. (ECF No. 16.) The Amended Complaint was filed on October 25, 2024, and Defendants filed the pending Motion to Dismiss on November 26, 2024. (ECF No. 26.) On January 21, 2025, Plaintiff filed her opposition, and, on January 23, 2025, Defendants submitted a letter in further support of the Motion to Dismiss. (ECF Nos. 29, 31.)

## II.    LEGAL STANDARD

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)).    When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021)).

A defendant moving to dismiss under Rule 12(b)(6) bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231-32 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III.    **DISCUSSION**

### A.    **Counts I-III: Claims under 42 U.S.C. § 1983 and the NJCRA**

As Plaintiff notes in her opposition brief, in Count I of the Amended Complaint, she asserts that Monmouth County and MCSO, acting through Golden, Freeman, and Iannello, "[f]ailed to protect [Daniel] from harm" by: "(1) permitting and allowing violations of a policy mandating continuous inmate monitoring in the kitchen;" and "(2) failing to train, supervise and discipline their subordinates on the policies and their enforcement designed to deter and stop inmate-on-inmate violence, despite knowledge gained from NJDOC data, lawsuits and other sources that inmate-on-inmate violence at MCCI was widespread."[6] (ECF No. 29 at 15-16; *see also* ECF No.

---

[6]    In Count I, Plaintiff names the Policymaker Defendants in their official capacities. (ECF 23 ¶ 138.)  However, "a lawsuit against public officers in their official capacities is functionally a suit against the public entity that employs them." *Cuvo v. De Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006) (citing *McMillian v. Monroe Cnty.*, 520 U.S. 781 (1997)).  Plaintiff brings an individual capacity claim against the Policymaker Defendants in Count II. (ECF No. 23 ¶ 148.)  The Court accordingly construes Count I as only asserting a *Monell* claim against Monmouth County and MCSO.

23 ¶¶ 107-38.)  In Count II, Plaintiff alleges that the CPO and the Field Supervisor Defendants are liable under § 1983 in their individual capacities because, *inter alia,* they had the responsibility to ensure that Daniel was not left unsupervised with other inmates, especially Raczkiewicz, "who was known as a very large, strong man with the capacity to inflict severe harm on others," they were deliberately indifferent to these known dangers, and the CPO and Field Supervisor Defendants failed in their ministerial duties to comply with SOPs regarding staffing, assignments, posts, and security, to supervise their subordinates, and to monitor and observe Daniel as well as Raczkiewicz.  (ECF No. 23 ¶¶ 142-44.)  With respect to the Policymaker Defendants, they are allegedly "liable in their individual capacities for the same actions, deliberate indifference to the safety of Plaintiff Daniel and failure to remediate as set forth in Count I."  (*Id.* ¶ 148 (emphasis omitted).)  In Count III, Plaintiff asserts equivalent claims under the NJCRA.  (*Id.* ¶¶ 154-68.)

### 1.    *Monell*, Supervisory Liability, and Failure to Protect

In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court recognized that, while local government units can be liable under § 1983,[7] "a municipality cannot be held liable under [the federal civil rights statute] on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691.  Thus, a local government cannot be held liable for "an injury inflicted solely by its employees or agents."  *Id.* at 694.  However, a plaintiff may hold a municipality liable if she shows that the municipality's "choices were the 'moving force' behind the constitutional violation."  *Hightower v. City of Philadelphia*, 130 F.4th 352, 356 (3d Cir. 2025) (quoting *Monell*, 436 U.S. at 694).  A plaintiff may allege that an unconstitutional policy or custom of the municipality caused his or her injuries by demonstrating an affirmative link between the

---

[7]    Plaintiff raises her civil rights claims under both § 1983 and the NJCRA.  The NJCRA is New Jersey's analogue to a federal civil rights claim under § 1983, and a claim under the NJCRA is generally construed identically to an equivalent federal claim and is subject to the same defenses. *See, e.g.*, *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011).

policy or custom and the alleged constitutional violation. *See Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). "To satisfy the pleading standard, [a plaintiff] must identify a custom or policy and specify what exactly that custom or policy was." *McTernan v. City of York*, 564 F.3d 636, 638 (3d Cir. 2009) (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)).

A plaintiff may demonstrate an unconstitutional municipal policy or custom in three ways:

> There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." [*Bd. of County Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 417 (1997) (Souter, J., dissenting))]. The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" [*Id.* at 417–18] (quoting *City of Canton, Ohio v. Harris*, [489 U.S. 378, 390] (1989)); *see also* [*Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000)] (holding that plaintiff must "demonstrat[e] that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences").

*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003).

To plead a "failure to act affirmatively" claim, the plaintiff must allege facts showing "there was an obvious and clear need for the affirmative promulgation of a new policy to address deficiencies which, if left uncorrected, were so likely to cause a violation such as the one the plaintiff suffered that the defendant in question can be said to have been deliberately indifferent to the deficiency." *Young v. Monmouth Cnty.*, No. 24-4975, 2025 WL 354447, at *3 (D.N.J. Jan. 31,

2025) (citing *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222-23 (3d Cir. 2015); *Natale*, 318 F.3d at 584).

"Under *Monell*, deliberate indifference requires 'proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Hightower*, 130 F.4th at 357 (citing *Bryan Cnty.*, 520 U.S. at 410). "Ordinarily, this means that a plaintiff must show that "[a] pattern of similar constitutional violations' put the city on notice that, by failing to act, it was being deliberately indifferent to inmates' rights." *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 62 (2011)); *see also Schlaybach v. Berks Heim Nursing & Rehabilitation*, 839 F. App'x 759, 760 (3d Cir. 2021) (stating that the plaintiff must identify a specific policy or custom of the municipality that amounts to deliberate indifference to constitutional rights and, in most cases, deliberate indifference requires the plaintiff to allege a pattern of similar past conduct).

"The Supreme Court has 'hypothesized' that 'in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference,'" providing as a hypothetical example a city arming its police with guns without any legal training on when to use them. *Hightower*, 130 F.4th at 357 (citing *City of Canton*, 489 U.S. at 390 n.10) (concluding that "[f]ailing to temporarily segregate inmates falls far short of giving police guns without training them on the law of deadly force").

Similarly, a policymaking or supervisory official may be held individually liable for his or her personal involvement in alleged constitutional violations. *See Chavarriaga*, 806 F.3d at 222; *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988).

There are two potential theories of supervisory liability. *See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Under the first theory, officials may be sued "if it is shown that such defendants, 'with deliberate indifference to the consequences,

established and maintained a policy, custom, or practice which directly caused [the] constitutional harm.'" *Id.* (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). The second theory of supervisory liability provides that a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his or her subordinates' violations. *See Baker v. Monroe Township*, 50 F.3d 1186, 1190-91 (3d Cir. 1995).

A plaintiff may bring a claim for the municipality's or supervisor's failure to train, supervise, or discipline subordinates. *See Young*, 2025 WL 354447, at *3. The failure-or-inadequacy theory of liability requires a plaintiff to establish that a municipality's or supervisory official's failure to train, supervise, or discipline "amounts to deliberate indifference to the rights of persons with whom the [subordinates] come into contact." *Kelley v. Reyes*, No. 19-17911, 2025 WL 618207, at *21 (D.N.J. Feb. 26, 2025) (quoting *City of Canton*, 489 U.S. at 388); *see also Young*, 2024 WL 354447, at *3. "This consists of establishing whether '[1] municipal policymakers know that employees will confront a particular situation, [2] the situation involves a difficult choice or a history of employees mishandling, and [3] the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Kelley*, 2025 WL 618207, at *21 (quoting *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019)).

The plaintiff must allege facts showing that the failure to act reflects a deliberate or conscious choice. *See Beers v. Cnty. of Northumberland*, No. 23-2555, 2024 WL 2874283, at *3 (3d Cir. June 7, 2024) (per curiam); *Est. of Roman*, 914 F.3d at 798. "Additionally, 'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (alteration in original) (quoting

*City of Canton*, 489 U.S. at 391); *see also Beers*, 2024 WL 2874283, at *3 (same). "Establishing a failure to train claim under Section 1983 is difficult and applies in narrow situations." *Cooper v. City of Paterson*, No. 23-3566, 2024 WL 1298917, at *5 (D.N.J. Mar. 27, 2024) (citing *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997); *City of Canton*, 489 U.S. at 387)); *see also Young*, 2025 WL 354447, at *3 (stating that a municipality's culpability is at its most tenuous where a claim rests on a failure to train and will only be tenable where the failure to train amounts to deliberate indifference to the rights of persons in contact with untrained personnel).

A pattern of similar constitutional violations by untrained (or unsupervised or undisciplined) employees is ordinarily required to demonstrate deliberate indifference for purposes of a claim for failure to train, supervise, or discipline. *See Thomas,* 749 F.3d at 223; *Young*, 2025 WL 354447, at *3. However, "[a] mere pattern of a handful of vaguely similar constitutional violations is generally insufficient to meet this requirement." *Young*, 2022 WL 354447, at *3 (quoting *Connick*, 563 U.S. at 61-62) (noting that, in *Connick*, the Supreme Court held that "having four convictions overturned for *Brady* violations over ten years was insufficient to support a failure to train claim where those violations were dissimilar to the specific *Brady* violation").

"Nevertheless, the Supreme Court posited in *Canton* that in certain situations, the need for training 'can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights' even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223 (quoting *City of Canton*, 489 U.S. at 390 n.10). Single-incident claims depend on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Id.* at 223-24 (alteration in original) (quoting *Bryan Cnty.*, 520 U.S. at 409). "[S]uch a claim "is not viable in

the absence of an extremely obvious deficiency." *Young*, 2025 WL 354447, at *3 (citing *Connick*, 563 U.S. at 63-64).

Here, Plaintiff's *Monell* claim against Monmouth County and MCSO, her supervisory liability claim against the Policymaking and Field Supervisor Defendants, and the claim against rank-and-file CPO Defendants are premised on their respective failures to protect Daniel from harm. (*See* ECF No. 23 ¶¶ 107-68.) The Eighth Amendment imposes a general duty on prison officials to protect convicted inmates from violence by other prisoners. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Similarly, pretrial inmates have a right under the Fourteenth Amendment to "security from physical assault by fellow prisoners." *Hightower*, 130 F.4th at 356 (citing *Davidson v. O'Lone*, 752 F.2d 817, 821 (3d Cir. 1984)). "A prison violates that duty [to protect pretrial detainees and convicted prisoners] if it (1) creates conditions that 'pose[] a substantial risk of harm' and (2) is deliberately indifferent 'to inmate health or safety.'" *Id.* (alteration in original) (quoting *Farmer*, 511 U.S. at 834).

It is undisputed for purposes of the pending Motion to Dismiss that, under either the Eighth or the Fourteenth Amendment,[8] "[d]eliberate indifference" is a subjective standard whereby "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001)), *abrogated on other grounds as recognized by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020). As noted by the Third Circuit:

> [i]t is not sufficient that the official should have known of the risk. [*Beers-Capitol*, 256 F.3d at 133]. A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety "in the usual ways, including inference from circumstantial evidence."

---

[8]    According to Plaintiff, she could not conclusively ascertain whether Daniel was a pretrial detainee or a convicted prisoner when he was killed, and "it is assumed that decedent was convicted." (ECF No. 29 at 20 n.2.) "However, the analysis under either an Eighth [A]mendment or Fourteenth Amendment review is the same." (*Id.* (citations omitted)).

> *Farmer*, [511 U.S. at 842].  In other words, "a factfinder may
> conclude that a prison official knew of a substantial risk from the
> very fact that the risk was obvious." *Id.*

*Id.* at 367.  To satisfy the deliberate indifference requirement, a plaintiff may allege facts plausibly

indicating either that the official had notice of a particularized risk of a specific inmate being

attacked by others or the existence of a longstanding and pervasive problem known to the official:

> For example, if an Eighth Amendment plaintiff presents evidence
> showing that a substantial risk of inmate attacks was "longstanding,
> pervasive, well-documented, or expressly noted by prison officials
> in the past, and the circumstances suggest that the defendant-official
> being sued had been exposed to information concerning the risk and
> thus 'must have known' about it, then such evidence could be
> sufficient to permit a trier of fact to find that the defendant-official
> had actual knowledge of the risk."

*Farmer*, 511 U.S. at 842-43 (citation and footnote omitted); *see also Keeling v. Wetzel*, No. 23-

2045, 2024 WL 3770307, at *3 (3d Cir. Aug. 13, 2024) (per curiam) (considering whether

allegations indicate that the inmate's cellmate "made specific threats of serious harm, describe a

history of physical conflict with that cellmate, or otherwise suggest that a substantial risk of being

attacked by his cellmate was 'longstanding, pervasive, well-documented or expressly noted by

prison officials in the past'" (quoting *Farmer*, 511 U.S. at 842)); *Jeremiah v. Kovach*, No. 20-

1915, 2022 WL 21778340, at *7 (M.D. Pa. Feb. 28, 2022) (stating that, under *Farmer*, an inmate

could demonstrate deliberate indifference by showing either a failure to respond to a particularized

threat to the victim or a substantial, long-standing, pervasive, or expressly noted risk of inmate

attacks in circumstances suggesting that the official had been exposed to such information (quoting

*McGlinchey v. Lane*, No. 18-14, 2020 WL 2513536, at *6 (W.D. Pa. May 15, 2020))).

### 2.    Deliberate Indifference

According to the County Defendants, "[m]uch of the Amended Complaint relies on

demonstrating the Defendants were deliberately indifferent to the risk of injury that the decedent

would be attacked," "an essential element of willful indifference is awareness of the specific problem," and "[n]owhere in the Amended Complaint does the Plaintiff cite to proof of a specific problem between two inmates who had been identified as 'trustees;' or some specialized belief that the decedent was in any particularized danger." (ECF No. 31 at 2; *see also* ECF No. 26-1 at 19.) According to the County Defendants, video footage of the attack purportedly shows that "the allegations that there was no supervision of the kitchen, nor prompt response to injury, are demonstrably false."[9] (ECF No. 26-1 at 13.) The County Defendants further take issue with Plaintiff's reliance on prior lawsuits and articles on the grounds that: (1) Plaintiff simply assumes that the allegations in the lawsuits or articles are true despite the fact that the majority of the allegations were dismissed or otherwise resolved; (2) only one prior alleged incident involved prisoner-on-prisoner violence (which occurred over four years before Daniel's fatal attack); and (3) Plaintiff proceeds to "lump together" or "conflates" disparate alleged incidents not involving prisoner-on-prisoner violence. (ECF No. 26-1 at 10 & n.5; ECF No. 31 at 3.) The County Defendants also contend that the Court should disregard the allegations regarding "'NJDODC' statistics in 2022" because of the lack of "any reference [or citation] to the actual source of the statistics" and, even if the requisite verifiable source were provided, "statistics alone cannot provide a sufficient basis to impute actual knowledge." (ECF No. 31 at 3 (citations omitted); *see also* ECF No. 26-1 at 10 n.5.) According to the County Defendants, Plaintiff's claims ultimately rest solely on the legally unsupported premise that "a sudden attack by one inmate on another which is not prevented by the immediate presence of an officer is evidence of a failure of a constitutional magnitude." (ECF No. 31 at 1.)

---

[9]     The County Defendants submitted a copy of the video footage as Exhibit C to the certification of Sean J. Brennan, Esq. (*See* ECF No. 26-2.)

However, the Court finds that Plaintiff alleges sufficient factual content to raise a reasonable inference that the County Defendants were deliberately indifferent. *See Clark*, 55 F.4th at 178. In fact, as Plaintiff notes (*see* ECF No. 29 at 1), the County Defendants' arguments are generally better suited for a summary judgment motion filed after the parties have an opportunity to conduct discovery.

Even assuming *arguendo* that the Court is permitted to consider the contents of the video footage at this preliminary stage of the proceeding,[10] the Court does not find Plaintiff's allegations as to what occurred in the kitchen on the morning of April 16, 2022 to be "demonstrably false," (ECF No. 29 at 13-15). For instance, it appears that no correctional officer is seen in the video at the exact moment of the attack.

In addition, to the extent that the County Defendants indicate that a plaintiff may pursue a claim that officials failed to protect an inmate only if there is "proof of a specific problem" between the victim and the assailant or "some specialized belief that the [victim] was in any particularized danger" (ECF No. 31 at 2) they are incorrect. As both Plaintiff and the Court have noted, *see supra* Section III.A.1.; (ECF No. 29 at 32), an inmate may demonstrate deliberate indifference not only by showing that prison officials failed to respond to a "particularized threat" to the victimized inmate but also by "showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk." *McGlinchey*, 2020 WL 2513536, at *2 (quoting *Farmer*, 511 U.S. at 842). At this preliminary stage, Plaintiff adequately pleads a longstanding and pervasive problem of inmate attacks at the

---

[10] Plaintiff and the County Defendants dispute whether the Court is permitted to consider the video under the rule allowing courts to consider materials outside of the four corners of the complaint if they are integral or explicitly relied upon in the complaint. (*See* ECF No. 26-1 at 1-2; ECF No. 29 at 13-15.)

MCCI based on: (1) data from state correctional officials regarding the large number of inmate assaults reported at the facility; (2) a lawsuit filed by an MCCI inmate claiming that he was beaten by MCCI correctional officers; and (3) lawsuits or reports concerning incidents in which other inmates at the MCCI were physically assaulted by correctional officers or illicit drugs were smuggled to inmates, putting them at risk of physical harm.

According to the Amended Complaint: "Data collected from New Jersey Department of Corrections inspection reports covering 2022 found that at MCCI, with an average reported daily census of 531 inmates, an average of two assaults on inmates were reported each week. This is the equivalent of 104 inmate assaults per year, an excessive amount that required remediation." (ECF No. 23 ¶ 83.) The County Defendants contend that this allegation should be disregarded because Plaintiff purportedly does not provide any citation or reference to the source of the statistics. (ECF No. 26-1 at 10 n.4; ECF No. 31 at 3-4.) However, the Amended Complaint explicitly states that "the source" of the prison assault statistics is the NJDOC's 2022 inspection reports for the MCCI. The County Defendants do not cite to any authority that a pleading must provide more detailed sourcing or citation to allow a Court to consider a factual allegation for purposes of ruling on a motion to dismiss for failure to state a claim. The Court must accept as true the alleged facts regarding such reports and draw all reasonable inferences from the facts in favor of Plaintiff. *See Wilson*, 57 F.4th at 140. Furthermore, "there is no requirement that the pleader attach a copy of the writing on which [her] claim for relief or defense is based."[11]  C.

---

[11]    The Court notes that that by signing, filing, and advocating the Amended Complaint, Plaintiff's attorney certified to the best of her knowledge, information, and belief, formed after a reasonable inquiry, that the "factual contentions [regarding, *inter alia*, the NJDOC statistics] have evidentiary support." Fed. R. Civ. P. 11(b)(3)); *see also Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 498 U.S. 533, 551 (1991) (stating that Rule 11 imposes an affirmative duty to conduct a reasonable inquiry into the factual and legal basis of claims before filing them with the court).

Wright, A. Miller & E. Cooper, 5A Federal Practice and Procedure: Pleadings and Motions § 1327 (footnote omitted).

Accepted as true, the NJDOC statistics plausibly indicate that there was an existing pattern of inmate assaults at the time that Daniel was fatally attacked in the kitchen on April 16, 2022. In fact, while the County Defendants assert the overly broad or incomplete statistics must be treated carefully, they do not point to any actual deficiencies in the alleged figures. The County Defendants also cite to cases ruling on defendants' summary judgment motions, and, in two of the three decisions, the court ultimately relied on statistics together with other evidence to deny summary judgment. (ECF No. 31 at 4.) For instance, the court in *Merman v. City of Camden*, 824 F. Supp. 2d 581 (D.N.J. 2010), recognized that statistical evidence, isolated and without context, generally may not justify a finding of a municipal policy or custom authorizing or condoning unconstitutional police actions, *id.* at 591. However, the *Merman* court denied summary judgment, stating, *inter alia*, that "[g]iven the sheer number of civilian complaints in relation to the number of officers, and the pattern of escalation over the years, the significance of plaintiff's quantitative evidence is, unquestionably, substantial and greatly informs this Court's decision" and that the plaintiff provided additional evidence to "bolster" and "contextualize" this statistical evidence (such as internal affairs reports showing the deficiencies in the internal investigations). *Id.* at 591-93; *see also Forero v. Atl. City*, No. 11-1630, 2014 WL 1301535, at *3 (D.N.J. Mar. 31, 2014) (denying city's summary judgment motion concerning an alleged municipal custom of acquiescing in its officers' use of excessive force given the statistics of excessive force complaints lodged and sustained and the other evidence showing, among other things, that the officer had been the subject of several prior complaints); *Franks v. Cape May Cnty.*, No. 07-6005, 2010 WL 3614193, at *12 (D.N.J. Sept. 8, 2010) ("Nor does Frank's citation to statistics showing the number of

23

unsubstantiated complaints support her allegations. . . . Rather than simply reciting a number of

complaints or offenses, a plaintiff must show 'why those prior incidents deserved discipline and

how the misconduct in those cases is similar to that involved in the present action.'" (footnote and

citation omitted)).

For her part, Plaintiff similarly "bolsters" and "contextualizes" the alleged statistics by

citing to prior lawsuits and articles involving harms inflicted on MCCI inmates, *Merman*, 824 F.

Supp. 2d at 591. The County Defendants assert that the Court should disregard the prior lawsuit

allegations because "Plaintiff here states the allegations *as if they were verified facts*" but "the

existence of a lawsuit does not prove the allegations contained in that lawsuit." (ECF No. 26-1 at

10.) However, the County Defendants admit that Plaintiff cites to two rulings from this District

denying motions to dismiss "in which counsel had also simply relied on other lawsuits."[12] (ECF

No. 31 at 3 (citing ECF No. 29 at 28).) Although they suggest that the two decisions were incorrect,

the County Defendants do not cite to any case law indicating that it is improper to rely in an initial

pleading on allegations of similar misconduct asserted in prior lawsuits to raise a reasonable

inference of deliberate indifference.

---

[12]    In *Goodell*, "Plaintiff alleges these Defendants were aware of prior incidents of excessive
force but failed to address their deficient policies; failed to adequately train the officers on
excessive force; and failed to adequately discipline the officers for use of excessive force."
*Goodell v. Lanigan*, No. 18-16588, 2020 WL 525927, at *5 (D.N.J. Jan. 31, 2020) (citations
omitted). "[I]n light of those specific allegations, which are not addressed by Defendants, their
Motion to Dismiss the supervisory liability claims is denied." *Id.* (footnote omitted). In the other
case by Plaintiff (*Garreffi v. Hicks*, No. 20-16396), the court rejected the policymaker defendants'
assertion that the second amended complaint failed to allege with requisite detail a policy or
practice creating an unreasonable risk of a constitutional violation. (ECF No. 29-1, Ex. B a 3.)
"However, Plaintiff has outlined a documented history of more than a dozen recent allegations and
reports of excessive force, sexual assault, and the failure to provide medical attention among DOC
facilities, including NSP." (*Id.* (citation omitted) (noting, for example, that the plaintiff cites to
excessive force incidents in 2016 and 2019 and failures to provide required medical attention in
2016, which did not result in any disciplinary actions).)

Considering the substance of the prior lawsuits referenced in the Amended Complaint, one of the cases involved an alleged incident of prisoner-on-prisoner violence in which an inmate (Torres) was attacked by another inmate, Torres's request to be moved to another area was denied, and the same inmate, together with five to six other inmates, subsequently attacked Torres, dragged him to a different area, and physically and sexually assaulted him, while the corrections officers on duty did not prevent the attack. (ECF No. 23 ¶ 82.) The alleged Torres attacks occurred over four years before the fatal incident in this case, but Plaintiff alleges more recent incidents involving either violence directed against MCCI inmates or activities placing inmates at serious risk of death or serious physical harm (*e.g.,* including a lawsuit alleging that an inmate was pepper sprayed despite the fact he was cooperating with officers). (*Id.* ¶ 90.)

In sum, Plaintiff cites to one lawsuit alleging assaults by another inmate; five lawsuits involving alleged officer-on-inmate violence; and two drug smuggling conspiracies involving MCCI personnel.[13] (*Id.* ¶¶ 82, 86-92.) There are differences between the past incidents and the fatal assault at issue in this case, including, for instance, the fact that this case does not involve either drug smuggling or overdoses or instances of correctional officers assaulting inmates. However, given these prior alleged incidents—and the NJDOC statistics, the Court concludes that Plaintiff alleges sufficient facts to state a facially plausible claim that the respective County Defendants acted (or failed to act) with deliberate indifference.[14] *See Est. of Johnson v. Cnty of*

---

[13]    Plaintiff also alleges that two inmates suffered fatal drug overdoses at the MCCI, but their overdoses occurred after Daniel's death. (ECF No. 23 ¶¶ 93-94); *see also Corbin v. Bucks Cnty.,* 703 F. Supp. 3d 527, 536 n.3 (E.D. Pa. 2023) (indicating that drug overdoses that occurred after the decedent's death had no bearing on the subjective prong of a failure-to-protect claim).

[14]    According to the County Defendants, "[a] search of publicly available documents in Pacer would show that the majority of allegations [in the cited litigation] were dismissed as a result of a motion or otherwise resolved." (ECF No. 26-1 at 10 n.5.) The County Defendants do not identify the specific claims raised in the cited lawsuits that were dismissed, address the procedural posture

*Sacramento*, No. 23-1304, 2024 WL 279137, at *5 (E.D. Cal. Jan. 25, 2024) (stating that plaintiffs adequately alleged inadequate supervision, monitoring, and observation of inmates by identifying several incidents where, although "the specific facts are distinguishable," "they say a lack of monitoring and observation of inmates has resulted in delays in care and, ultimately, death from overdose, withdrawal, and assault by other inmates" (citation omitted)); *Shorter v. Samuels*, No. 16-1973, 2019 WL 6492534, at *5 (M.D. Pa. Dec. 3, 2019) (concluding that the plaintiff adequately pled that the supervisory defendants had personal knowledge of and acquiesced in ongoing inmate-on-inmate violence derived from "reports, audits, complaints, and other sources").

Accordingly, given the specific alleged facts regarding the NJDOC inmate assault data, prior lawsuits involving inmate-on-inmate and officer-on-inmate violence, and two drug smuggling conspiracies at the MCCI, the County Defendants' characterization of Plaintiff's argument as "rest[ing] solely on the premise that a sudden attack by one inmate on another which is not prevented by the immediate presence of an officer is evidence of a failure of . . . constitutional magnitude" is unfounded. (ECF No. 31 at 1.) The County Defendants cite to prior cases stating, *inter alia*, that "[t]he Third Circuit 'has never held that video monitoring of all pretrial detainees is required or, conversely, that failure to implement such monitoring demonstrates deliberate indifference" (ECF No. 26-1 at 16 (quoting *Vargo v. Plum Borough*, No. 06-1574, 2008 WL 5104934, at *17 (W.D. Pa. Nov. 26, 2008)); complaints about the number and placement of

---

of such dismissals (*e.g.*, whether they were dismissed was on a Rule 12(b)(6) motion or a motion for summary judgment under Rule 56), or explain what they mean by "otherwise resolved." In fact, in *Torres,* the district court dismissed the *Monell* and supervisory liability claims because (unlike Plaintiff), Torres did not provide any well-pleaded facts to show that "there were prior similar incidents that would have put policymakers on notice that unlawful conduct was occurring" or "a pattern of prior incidents that would suggest a need for additional training or supervision." *Torres v. Monmouth Cnty. Corr. Institution*, No. 19-17704, 2021 WL 3773687, at *5-6 (D.N.J. Aug. 25, 2021). The *Torres* court also refused to dismiss the failure-to-protect claim against a correctional officer regarding the second incident with the inmate. *Id.* at *4.

correctional officers are insufficient to support a finding of deliberate indifference (ECF No. 31 at 4 (citing *Bernstein v. New Jersey*, 411 N.J. Super. 316, 338 (App. Div. 2010)); "[l]eaving an entire block of trustees unsupervised was not sufficient to demonstrate deliberate indifference" (*id.* at 4-5 (citing *Counterman v. Warren Cnty. Corr. Facility*, 176 F. App'x 234 (3d Cir. 2006)); and officers informed of a specific but conditional threat by one inmate to harm another specific inmate were not found to be deliberately indifferent (*id.* at 5 (citing *Freeman v. Miller*, 615 F. App'x 72 (3d Cir. 2015)). However, all four cases were decided on summary judgment.[15] *See Freeman*, 615 F. App'x at 74; *Counterman*, 176 F. App'x at 236; *Vargo*, 2008 WL 5104934, at *1; *Bernstein*, 411 N.J. Super. at 333.

In the end, the cases County Defendants cite further confirm that their various "deliberate indifference" arguments are better suited for a summary judgment motion as opposed to a motion to dismiss for failure to state a claim. *See Trussell*, 2025 WL 914923, at *19 ("the County Defendants' arguments appear better suited to a motion for summary judgment after the parties have an opportunity to conduct discovery." (citing *Corbin*, 703 F. Supp. 3d at 537 (denying motion to dismiss because the plaintiff's burden was to plausibly allege that prison officials knowingly ignored a substantial risk of serious harm and that whether or not she can substantiate these allegations will be resolved in discovery); *Corbin v. Bucks Cnty.*, No. 23-2784, 2024 WL 2980218, at *5-6 (D.N.J. June 13, 2024) (granting summary judgment to the defendants on the grounds that a jury could not conclude from the record evidence that they were deliberately indifferent to the

---

[15]    The respective plaintiffs in the cited case law also evidently did not present evidence of a documented longstanding problem with violence against inmates under *Farmer*. On the contrary, in *Counterman*, the Third Circuit specifically noted that "[t]he practice of leaving the trustee blocks unattended does not appear to have given rise to a pattern of violence among inmates," *Counterman*, 176 F. App'x at 241. As Plaintiff notes, *Vargo* involved the specific standards of proof in an inmate suicide case, *i.e.*, the inmate's vulnerability to suicide and indifference to those special needs. (ECF No. 29 at 31 (citing *Vargo*, 2008 WL 5104934, at *12, 15).)

decedent's health and safety)). The Court concludes that Plaintiff's Amended Complaint plausibly alleges deliberate indifference. The Moving Defendants may renew their arguments if they file for summary judgment after discovery is concluded.

B.    **Count IV: Negligence**

In Count IV, Plaintiff alleges a state law negligence claim against the County Defendants. (ECF No. 23 ¶¶ 169-87.) The County Defendants argue that Count IV must be dismissed pursuant to the New Jersey Tort Claims Act ("NJTCA"). (ECF No. 26-1 at 18-19.) N.J. Stat. Ann. § 59:5-2(b)(4) provides that "[n]either a public entity nor a public employee is liable for . . . any injury by . . . a prisoner to any other prisoner." However, the statute does not provide immunity if the conduct at issue "constituted a crime, actual fraud, actual malice or willful misconduct." *Est. of Vargas v. Cnty. of Hudson*, No. 2:14-cv-01048, 2020 WL 3481774, at *10 (D.N.J. June 26, 2020) (citing N.J. Stat. Ann. § 59:3-14); *see also Bernstein*, 411 N.J. Super. at 332. "Willful misconduct 'is not immutably defined but takes its meaning from the context and purpose of its use,'" and "falls somewhere 'between simple negligence and the intentional infliction of harm.'" *Vargas*, 2020 WL 3481774, at *10 (quoting *Fielder v. Stonack*, 141 N.J. 101, 124 (1995)). While willful misconduct "need not involve the actual intent to cause harm, there must be some knowledge that the act is wrongful." *Id.* (quoting *Fielder*, 141 N.J. at 124). A defendant is not entitled to immunity if there is a "showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Id.* (quoting *Berg v. Reaction Motors Div., Thiokol Chem. Corp.*, 37 N.J. 396, 414 (1962)).

Given the Court's determination that Plaintiff plausibly alleges that the County Defendants were deliberately indifferent for purposes of her § 1983 and NJCRA claims, the Court likewise

concludes that Plaintiff adequately pleads "willful misconduct" for purposes of the immunity provision.[16]  Accordingly, the Court denies the Motion to Dismiss as to Count IV.

### C.    Count V: Wrongful Death and Survivorship

In Count V of the Amended Complaint, Plaintiff seeks damages under "both the survivorship statute N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5." (ECF No. 23 ¶ 196.)  According to the County Defendants, "given that the negligence claims against the [County Defendants] should be dismissed pursuant to the [NJTCA], so too should Count [V] under the wrongful death and survivor acts." (ECF No. 26-1 at 21.)  The Court denies the Motion to Dismiss as to the negligence claim, *see supra* Section III.B., and it accordingly denies the Motion to Dismiss the derivative claims in Count V.

## IV.    CONCLUSION

For the reasons set forth above, and other good cause shown, the County Defendants' Motion to Dismiss is **DENIED**.  An appropriate Order follows.

DATED: July 29, 2025

**GEORGETTE CASTNER**
**United States District Judge**

---

[16]    In their reply brief, the County Defendants assert that one cannot "willfully" act "negligently." (ECF No. 31 at 5 ("If the officers were willful in their misconduct, they could not be negligent.").)  However, under Count IV, Plaintiff "repeats and reallege each and every paragraph contained in this Complaint and incorporate same as if set forth fully herein" (ECF No. ¶ 169), including the deliberate indifference allegations.  The County Defendants also do not cite any case law adopting their approach, even though Plaintiff cites to a ruling applying another state's equivalent willful misconduct exception to common law negligence claims. (ECF No. 29 at 36 (quoting *Wilson v. Dunn*, 618 F. Supp. 3d 1253, 1286 (N.D. Ala. Jul. 28, 2023) ("Under this [Alabama] exception, a prisoner may defeat State-agent immunity—even when proceeding under a negligence theory—by sufficiently alleging that prison officials acted knowingly or in violation of prison policy." (citation omitted)).)